No. 22-20383

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

RANDALL KALLINEN,

*Plaintiff-Appellant*,

v.

JUDGE MICHAEL NEWMAN,

*Defendant-Appellee*.

---

On Appeal from the United States District Court
for the Southern District of Texas

---

**PLAINTIFF-APPELLANT'S BRIEF**

---

Alexander C. Johnson
511 Broadway Street
Houston, Texas 77012
(573) 340-3316

Martin J. Siegel
  *Director*
Melissa Holmes
Yovana Marinkovik
Matthew Welsh
  *Student Attorneys*
Appellate Civil Rights Clinic
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204
(713) 743-2100

*Attorneys for Plaintiff-Appellant*

**No. 22-20383**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

RANDALL KALLINEN,

*Plaintiff-Appellant*,

v.

JUDGE MICHAEL NEWMAN,

*Defendant-Appellee.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and

entities described in the fourth sentence of Rule 28.2.1 have an interest in the

outcome of this case. These representations are made in order that the judges of

this court may evaluate possible disqualification or recusal.


**Plaintiff-Appellant**:

    Randall Kallinen

**Counsel for Plaintiff-Appellant**:

    Alexander C. Johnson
    511 Broadway Street
    Houston, Texas 77012

Martin J. Siegel
Melissa Holmes
Yovana Marinkovik
Matthew Welsh
Appellate Civil Rights Clinic
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204

**Defendant-Appellees**:

Judge Michael Newman

**Counsel for Defendant-Appellees**:

Laura Beckman Hedge
Christian Menefee
Harris County Attorney's Office
1019 Congress, 15th Fl.
Houston, TX 77002

s/    *Martin J. Siegel*
Martin J. Siegel
*Attorney of Record for*
*Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

This case involves the important and increasingly common question whether a state official can censor unwanted speech on a Facebook page he designed to look official and governmental, and which he uses in connection with his public duties.  When a Houston lawyer posted criticism on what he alleges to be the official page of a county probate judge, the judge removed the offending posts and blocked the critic from saying more.  Appellant, the lawyer, alleges that the judge acted under color of law and violated the First Amendment by suppressing his speech because of its content.

As the trial court recognized, this Court "has not directly addressed the question of when a public official using a social media account is acting under color of law."  ROA.478.  Yet cases like this are rapidly multiplying as virtually every official turns to social media to communicate with the public.  Consequently, five circuits and several district courts have weighed in on the factors and types of circumstances that should be considered in deciding whether state action has occurred in this setting.  As this Court considers the question, it should grant and hear argument in order to reap the benefit of the fullest possible adversarial presentation and assistance from counsel.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................. i

STATEMENT REGARDING ORAL ARGUMENT .................................................. iii

TABLE OF CONTENTS ................................................................... iv

TABLE OF AUTHORITIES ............................................................... vii

JURISDICTIONAL STATEMENT ......................................................... xiii

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................... xiv

INTRODUCTION......................................................................... 1

STATEMENT OF THE CASE ............................................................... 3

      I     Judge Newman Created and Maintained a Facebook
Page Designed and Used in Connection With His
Judicial Work ....................................................................... 3

      II.    Judge Newman Removed Kallinen's Criticism and
Then Blocked Him Entirely ........................................................... 12

      III.   Kallinen Sued Newman Under 42 U.S.C. § 1983,
and the District Court Dismissed the Case Under
Fed. R. Civ. P. 12(b)(6) ............................................................ 14

SUMMARY OF THE ARGUMENT ........................................................... 16

ARGUMENT .......................................................................... 18

      I.     Standards of Review ........................................................ 18

            A.    Standard of Review of the District Court's
Dismissal Under Rule 12(b)(6) ............................................... 18

            B.    The Court Reviews Denial of Kallinen's Motion
to Amend for Abuse of Discretion ........................................... 20

II.    The District Court Erred in Dismissing the Case
Because Kallinen Adequately Pleaded a Violation of
his First Amendment Rights ........................................... 20

    A.    Section 1983's "Color of Law" Requirement........ 20

    B.    Kallinen Adequately Pleaded State Action ........... 22

        1.    Several Courts Have Consistently
Applied Standards for Determining
When Officials' Use of Social Media
Constitutes State Action ................................. 22

            a.    Use of the Medium in Connection
With Official Business ........................... 23

            b.    Trappings of an Official Account .......... 26

            c.    Suppressing Speech About Official
Matters .................................................... 27

            d.    Use of State Resources to Establish
or Maintain the Account ....................... 28

        2.    Kallinen Sufficiently Pleaded State Action
According to These Factors ........................... 29

        3.    The District Court's Grounds for Dismissal
Are Erroneous and Held Kallinen to an
Unduly High Burden ...................................... 36

III.    The Court Should Have Allowed Kallinen to
Amend His Complaint ................................................. 45

IV.    The District Court Erred in Extending Qualified
Immunity to Judge Newman ....................................... 48

    A.    The Qualified Immunity Standard ...................... 48

B.  Qualified Immunity is Unwarranted
Because Kallinen's Rights in this
Circumstance Were Clearly Established ............. 50

CONCLUSION ................................................................................. 55

CERTIFICATE OF SERVICE ............................................................. 56

CERTIFICATE OF COMPLIANCE ...................................................... 57

# TABLE OF AUTHORITIES

**Cases**                                                                    **page:**

*Arnold v. Williams,*
   979 F.3d 262 (5th Cir. 2020) ...................................................... 19

*Ashcroft v. al-Kidd,*
   563 U.S. 731, (2011) ................................................................... 48

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .................................................................... 19

*Attwood v. Clemons,*
   526 F. Supp. 3d 1152 (N.D. Fl. 2021) ............................... *passim*

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 554 (2007) .................................................................... 18

*Blackwell v. City of Inkster,*
   2022 WL 989212 (E.D. Mich. Mar. 21, 2022) .................. *passim*

*Brentwood Acad. v. Tenn. Secondary School Athletic Ass'n,*
   531 U.S. 288 (2001) .................................................................... 21

*Brown v. Callahan,*
   623 F.3d 249 (5th Cir. 2010),
   *cert. denied,* 563 U.S. 1021 (2011) ........................................... 48

*Buehler v. Dear,*
   27 F.4th 969 (5th Cir. 2022) ...................................................... 48

*Bustos v. Martini Club, Inc.,*
   599 F.3d 458 (5th Cir. 2005) ..................................................... 21

*Campbell v. Reisch,*
   986 F.3d 822 (8th Cir. 2021) .............................................. *passim*

*Camreta v. Greene,*
   563 U.S. 692 (2011) .................................................................... 49

*Clark v. Kolkhorst*,
   2021 WL 5783210 (W.D. Tex. Dec. 7, 2021) ................................... 27, 45

*Davison v. Randall*,
   912 F.3d 666 (4th Cir. 2019) ................................................................ *passim*

*Doe v. Psychiatric Med. Ass'n*,
   102 F.3d 549, 1996 WL 670414 (5th Cir. 1996) ................................. 21, 22

*Dussouy v. Gulf Coast Inv. Corp.*,
   660 F.2d 594 (5th Cir. 1981) ............................................................... 20, 46

*Engle v. Lumpkin*,
   33 F.4th 783 (5th Cir. 2022) ................................................................. 49, 50

*Faison v. Jones*,
   440 F. Supp. 3d 1123 (E.D. Cal. 2020) ............................................. *passim*

*Felts v. Reed*,
   504 F. Supp. 3d 978 (E.D. Mo. 2020) ......................................... 25, 26, 45

*Felts v. Reed*,
   2022 WL 898768 (E.D. Mo., March 28, 2022) ........................... 24, 25, 39

*Garnier v. O'Connor-Ratcliff*,
   41 F.4th 1158 (9th Cir. 2022), *petition for cert. filed* (2022) ............. *passim*

*George v. SI Grp.*,
   36 F.4th 611 (5th Cir. 2022) ......................................................................... 19

*Hope v. Peltzer*,
   536 U.S. 730 (2002) ................................................................................... 49

*Inclusive Communities. Project, Inc. v. Lincoln Prop. Co.*,
   920 F.3d 890 (5th Cir. 2019),
   *cert. denied*, 140 S. Ct. 2506 (2020) ......................................................... 19

*Joseph v. Bartlett*,
   981 F.3d 319 (5th Cir. 2020) ...................................................................... 50

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
   928 F.3d 226 (2nd Cir. 2019), *cert. granted, judgment vacated*
   *as moot sub nom. Biden v. Knight First Amend. Inst. at*
   *Columbia Univ.*, 141 S. Ct. 1220 (2021) ........................................... *passim*

*Leuthy v. Lepage*,
   2018 WL 4134628 (D. Maine, Aug. 29, 2018).................................. 26, 45

*Lindke v. Freed*,
   37 F.4th 1199 (6th Cir. 2022) ........................................... *passim*

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
   594 F.3d 383 (5th Cir. 2010)....................................................... 19

*Lugar v. Edmonson Oil Co.*,
   457 U.S. 922 (1982)................................................................. 21

*Mayeaux v. La. Health Serv. & Indem. Co.*,
   376 F.3d 420 (5th Cir. 2004) .................................................... 46

*Morse v. Frederick*,
   551 U.S. 393 (2007)........................................................... 46, 47

*Mullinex v. Luna*,
   577 U.S. 7 (2015).................................................................. 48

*NetChoice, LLC v. Paxton*,
   __ F.4th __, 2022 WL 4285917 (5th Cir., Sept. 16, 2022) ......................... 1

*One Wisconsin Now v. Kremer*,
   354 F. Supp. 3d 940 (W.D. Wis. 2019) .................................. 45, 27, 33, 45

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017) ............................................................ 1

*Pearson v. Callahan*,
   555 U.S. 223 (2009)................................................................ 49

*Pierson v. Ray*,
   386 U.S. 547 (1967)................................................................ 47

*Republican Party of Minn. v. White*,
536 U.S. 765 (2002)............................................................................ 2, 47

*Robinson v. Hunt Cty., Tex.*,
921 F.3d 440 (5th Cir. 2019).................................................................. 52

*Roque v. Harvel*,
993 F.3d 325 (5th Cir. 2021).................................................................. 48

*Rosenberger v. Rector and Visitors of Univ. of VA.*,
515 U.S. 819 (1995)................................................................................ 54

*Rundus v. City of Dallas*,
634 F.3d 309 (5th Cir. 2011),
*cert. denied*, 565 U.S. 821 (2011)............................................................ 21

*Sammons v. McCarthy*,
2022 WL 2065976 (D. Md., June 8, 2022)........................................*passim*

*Stripling v. Jordan Production Co., LLC*,
234 F.3d 863 (5th Cir. 2000) ........................................................... 20, 46

*Swanson v. Griffin*,
2022 WL 570079 (10th Cir., Feb. 25, 2022),
*cert. denied*, 2022 WL 4651787 (2022).................................................... 52

*Swierkiewicz v. Sorema N. A.*,
534 U.S. 506 (2002)................................................................................ 19

*Taylor v. Books A Million, Inc.*,
296 F.3d 376 (5th Cir. 2002), *cert. denied*, 537 U.S. 1200 (2003)............ 19

*Tyson v. Sabine*,
42 F. 4th 508 (5th Cir. 2022).................................................................. 21

*United States v. Causey*,
185 F.3d 407 (5th Cir. 1999).................................................................. 21

*United States v. Davis,*
  971 F.3d 524 (5th Cir. 2020),
  *cert. denied,*142 S. Ct. 122 (2021) .......................................................... 21

*Villareal v. City of Laredo, Tex.,*
  44 F.4th 363 (5th Cir. 2022) ............................................................. 48, 49

*Wampler v. S.W. Bell Tel. Co.,*
  597 F.3d 741 (5th Cir. 2010) ................................................................. 18

*West v. Atkins,*
  487 U.S. 42 (1988) ................................................................................ 20

*West v. Shea,*
  500 F. Supp. 3d 1079 (C.D. Cal. 2020) ....................................... 25, 45, 53

*Windom v. Harshbarger,*
  396 F. Supp. 3d 675 (D. W. Va. 2019) ......................................... 25, 33, 45

*Wyatt v. Fletcher,*
  718 F.3d 496 (5th Cir. 2013) ................................................................. 48

## Constitutional Provisions, Statutes and Rules

U.S. Const. amend. I ............................................................................ *passim*

28 U.S.C. § 1291 ........................................................................................ xiii

28 U.S.C. § 1331 ........................................................................................ xiii

42 U.S.C. § 1983 ................................................................................. *passim*

Fed. R. Civ. P. 12 ................................................................................ *passim*

Fed. R. Civ. P. 15 ................................................................................. 20, 46

Tex. Est. Code Ann. § 53.101 ................................................................... 43

Tex. Penal Code Ann. § 39.02 ................................................................. 40

**Other Authorities**

Tᴇx. Cᴏᴅᴇ Jᴜᴅ. Cᴏɴᴅᴜᴄᴛ, Cᴀɴᴏɴ 3 ............................................................ 43

Tex. Ethics Comm. Op. No. 550 (2019) ........................................................ 40

Randy Wallace, *55 Year-Old Woman Worth Millions*
  *Says Harris County Probate Court trying to Find*
  *Her Incompetent*," Fᴏx26, Oct. 12, 2022 ........................................... 12, 13

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant alleges a violation of his rights under the First Amendment to the U.S. Constitution and 42 U.S.C. § 1983.  ROA.130-32.  The district court therefore had subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this appeal is taken from the district court's final judgment (denominated "Order of Dismissal") entered on July 20, 2022 disposing of the entire action and all claims.  ROA.489.  Plaintiff's timely notice of appeal was filed on July 28, 2022.  ROA.490-91.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether a state judge acts under color of law under 42 U.S.C. § 1983 in removing criticism from his Facebook page and blocking the critic where (i) the judge frequently uses the page in connection with his work, such as advising lawyers and litigants and reporting on completed trials and ceremonial functions; (ii) the page has myriad trappings of official status, including photos of the judge in his robe and behind the bench and images of his courtroom; (iii) the censored posts concern the judge's job performance; and (iv) determining whether the judge used public resources in creating or maintaining the page is impossible because no discovery was permitted.

2.    Whether Appellant should have been allowed to amend his complaint to add a claim for injunctive relief since the censorship he complains of is ongoing and now appears to be permanent.

3.    Whether qualified immunity applies where several circuits have articulated the same test for adjudicating § 1983 claims like this one; where the judge plainly failed that test if Appellant's allegations are credited, as they must be at this stage; and where the First Amendment violation should have been obvious in any case.

# INTRODUCTION

No one likes being accused of professional misconduct, and Texas Probate Judge Michael Newman is no exception.  When the plaintiff in this case, a Houston lawyer named Randall Kallinen, posted critical comments about the judge on the judge's official Facebook page, Judge Newman removed it and blocked Kallinen from the page entirely.  This suppression of speech and exclusion from that portion of "the modern public square" concerning Judge Newman continues to this day.  *NetChoice, LLC v. Paxton*, __ F.4th __, 2022 WL 4285917 at *13 (5th Cir., Sept. 16, 2022) (quoting *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017)).

Kallinen sued Judge Newman under 42 U.S.C. § 1983 for violating his rights under the First Amendment, but the district court dismissed under Fed. R. Civ. P. 12(b)(6), concluding that Kallinen hadn't alleged state action because Judge Newman's Facebook page is private.  In fact, Kallinen alleges and the excerpts of page in the record confirm that Judge Newman designed and used his page in a way that connoted official, governmental status and related to and furthered his judicial work.  He often posted about his court and his doings as a judge, advised lawyers and litigants appearing before him, made the page look official by using innumerable photos of the court and himself in his robe on the bench, and did other things to suggest it was

1

an official account.  Under a consistent body of law emerging from other courts, these factual allegations suffice to state a claim of state action and clear the low bar of Rule 12(b)(6).  In concluding otherwise, the district court effectively weighed the evidence against Kallinen and decided disputed questions of fact about the nature of the page.

The district court also dismissed on grounds of qualified immunity, but Judge Newman shouldn't be immunized for his First Amendment violation.  A robust consensus of law from other circuits should have put Judge Newman on notice that squelching criticism on his Facebook page violates the First Amendment, and the point is obvious in any case.  In addition, Kallinen should have been permitted to amend his complaint to add a claim for injunctive relief, which would obviate the qualified immunity inquiry.

As Justice Scalia recognized in *Republican Party of Minn. v. White*, elected state judges are important public officials whose decisions affect many, and who "make law" for many more.  536 U.S. 765, 784 (2002).  Yet Kallinen has been prevented from commenting about the work of one such judge on an official Facebook page open to everyone else.  That is a textbook violation of his constitutional right to free expression.

## STATEMENT OF THE CASE

This statement is drawn from the factual allegations of Kallinen's First Amended Complaint, the excerpt of Judge Newman's Facebook page Kallinen attached to his complaint, and the lengthier excerpts attached to the judge's motion to dismiss. These allegations and documents must be taken as true at this stage, and construed in Kallinen's favor. *See* Point I(C), *infra*.

### I.     Judge Newman Created and Maintained a Facebook Page Designed and Used in Connection With His Judicial Work

Michael Newman is probate judge in Houston. ROA.129 (¶ 7). He was first elected in 2018 but lost his bid for reelection when he was defeated in the Democratic primary held on March 1, 2022. ROA.246, 195. Beginning in at least December 2021, he created and then maintained a Facebook page where, generally, he posted three types of messages: communications relating to and furthering his work as a probate judge; posts promoting his primary campaign for renomination; and personal messages related mostly to his family. ROA.129 (¶ 7), ROA.149, ROA.248-352.

The following text and illustration appeared at the top of Judge Newman's Facebook page on March 1, 2022, when Kallinen filed his original complaint:



ROA.149.  As the photo illustrates, Judge Newman appeared in his robe in

front of the United States and Texas flags, sitting on the bench.  ROA.149.

The page was named "Michael Newman" and included the description

"Judge Probate Court 2."  ROA.149.  Its introduction listed Judge

Newman's occupation as "Judge, Harris County Probate Court 2."

ROA.149.  In May 2022, when Newman filed later copies of the Facebook

page with the district court, the campaign banner had been removed but the

official photo, page name, description and introduction remained the same.

ROA.248.

        Both before and after the primary election, Judge Newman repeatedly

used this page to communicate messages relating to his judicial work.

ROA.129 (¶ 8).[1]  Kallinen's amended complaint includes exhibits featuring

---

[1]  In his complaint, Kallinen alleges that Judge Newman's "Official page, in addition to
his re-election campaign, was used most mostly (at least 60-70%, if not more) for official
announcements and communications from his court, depictions of his official duties, and

several examples of this.  For instance, on December 2, 2021 Judge Newman shared: "Today's will contest was the 110th trial of my career. Counsel superbly represented their respective clients.  The professional courtesy they extended to each other, the opposing parties, the witnesses and the Court was exemplary and very appreciated."  ROA.177.  The post included this photo:



ROA.177.

The next day, Judge Newman shared photos from his vantage point behind the bench:

---

dispensation of public advise [*sic*] related to his official duties, as well as commentary from and interacting with citizens with respect to his service as an elected probate judge." ROA.129 (¶ 8).  By this Kallinen meant that campaign-related and official posts together "all make up about 60 to 70% of the Official Page."  ROA.366.



ROA.176.  He captioned this photo with the pronouncement, "With

appreciation & thanks to the Harris County Commissioners Court, Probate

Court 2 technology upgrades have been installed and are now fully

operational.  Lawyers and their clients will be able to start using the new

equipment next week."  ROA.176.

Two weeks later, Judge Newman again posted an official court

announcement on the page:

> Notice: Effective January 12, 2022, Probate Court 2 is adding
> another probate of will docket to its weekly schedule in order to
> accommodate the needs of the public.  This docket will make a
> total of four weekly will dockets.  It will allow us to probate up
> to 75 wills a week and permit the lawyers we service to begin
> their estate administrations sooner.  As we have seen a need for
> more hearings we added more dockets.  At my request, probate
> court 2 staff continue to increase the hearings on disputed cases
> heard each week.  We now hear contested cases at least four
> different times weekly.

ROA.175.  The post was also accompanied by this picture:



ROA.175

In addition to updates like these, Judge Newman often provided information or "tips" to the attorneys who practiced before him, such as: "Litigation Practice Tip: Rule 803 (6) of the Texas Rules of Evidence (TRE) is of primary interest in the admissibility of business records and can be very useful in cases involving breach of fiduciary duty, elder abuse & financial exploitation.  Practitioners should refer to this rule together with TRE 902 (10)."  ROA.172.  This post featured two photos:

 

ROA.172.  Similarly, on January 24, 2022, he offered a "[p]robate litigation practice tip" about how to remove an independent executor, also accompanied by a photo of himself behind the bench flanked by the Texas and United States flags.  ROA.311-12.  There were also "tips for preparing the persuasive motion," with similar official-looking photos, ROA.330, and recommendations for "effective motion and oral advocacy in probate court." ROA.332.

More generally, Judge Newman commonly posted announcements about progressing through and completing the court's business, before and after the March 1, 2022 primary election.  He informed the public about the court of appeals' denial of a mandamus petition in one of his cases, ROA.253; his completion of "trial number 120," ROA.267; his review and signing of orders over a weekend, ROA.305; completing a particular bench

trial, ROA.321; his preparation for "Probate Court 2's 39th trial of 2021,"
with a photo of him on the bench reading, ROA.339; and finishing "the 110th
trial of [his] career," also with photos.  ROA.352.

And Judge Newman updated his page with more than written posts.
On March 9, 2022, after the primary election, he updated his cover photo
with one from his courtroom:



ROA.173.

On March 18, 2022, also post-election, Judge Newman announced yet
another court-related development: "The latest technology upgrade at
Probate Court 2.  Large screen monitor outside courtroom entrance
displaying hearing information."  ROA.171.  The post included photos of the
computer monitors.  ROA.171.

Finally, before and after the primary, Judge Newman frequently used the page to communicate with the public about the administrative and ceremonial aspects of his work – functions typical of any elected state official. These included a post on the unveiling of a colleague's portrait, ROA.252; congratulations to his new briefing attorney on passing the bar, ROA.263-64; expressions of thanks to his court coordinator, bailiff, and other staff, ROA.308, ROA.326, ROA.334, ROA.348; participating with other elected officials in the dedication of a public plaza and presenting a $15,000 scholarship on the occasion, ROA.269; mentoring and swearing in recent law graduates, ROA.302, ROA.309, ROA.343, ROA.349; appearing at a community awards event, ROA.342; appearing at Texas Southern Law School, ROA.303; participating in a judicial panel on probate and guardianship issues for "members of the Houston Bar," ROA.316; and regular appearances on a radio show where he discussed estate planning and probate law. ROA.264, ROA.300, ROA.321.

Interspersed between these posts about his ongoing work as a probate judge, Judge Newman posted messages to promote his campaign, such as one that began "Reminder: Election Day is tomorrow. I am running for reelection as Judge of Harris County Probate Court 2. Before being elected to serve as Judge, I was a trial lawyer for 38 years…" ROA.149. He also

touted endorsements from lawyers and directed visitors to his campaign website.  ROA.150, ROA.157.  The page also contains a number of personal posts, including photos commemorating his wedding anniversary, family stories and pictures, vacation photos, and the like.  *See, e.g.*, ROA.249, ROA.253-62, ROA.269.

Judge Newman's official Facebook page was open for public viewing and boasted over 4,000 "friends," ROA.129-30 (¶ 10); ROA.248, near the 5,000-friend limit.  *See* "Why can't I send or accept a friend request on Facebook?," Facebook, https://www.facebook.com/help/211926158839933 ("You can have up to 5,000 friends on Facebook").  It had an open comment section where anyone, not simply his friends, could post a comment.  ROA.129-30 (¶ 10).  As a result, the posts cited above prompted many "likes" and responses ranging from pictures offering prayers to congratulations on his work.  ROA.129-30 (¶ 10), ROA.136-69.

Two other online outlets relate to Judge Newman.  One is an earlier Facebook page he created and maintained that, before he first took office on January 1, 2019, consisted of personal content and photos.  ROA.229-44.  He used this page to post at least one message promoting his first campaign for office in 2018.  ROA.235.  Second, Harris County maintains a website for Probate Court 2 that includes the court's address and phone number, a

docket schedule, and announcements about hearing schedules and COVID-
19.  *See* JUDGE MICHAEL NEWMAN, PROBATE COURT NO. 2,
https://probatecrt2.harriscountytx.gov/Pages/default.aspx (last visited Oct.
13, 2022).  The most recent court announcement appears to be over a year
old, however, and the site is not interactive and includes no mechanism for
public comment or feedback beyond notifying the webmaster about
technical problems with the site itself.  *See id.*

## II.    Judge Newman Removed Kallinen's Criticism and Then Blocked Him Entirely

Kallinen is a Houston lawyer with a Facebook account he sometimes
uses to share "political commentary."  ROA.128-29 (¶ 6).  Before posting
the comments that gave rise to this case, he sometimes used his Facebook
account to interact with Judge Newman's Facebook page.  ROA.128-29 (¶
6).

After an experience as a litigant in Judge Newman's court, Kallinen
concluded that the judge showed partiality toward "repeat players" who
practiced there – a claim echoed by at least one other litigant in Probate
Court No. 2, whose complaint was covered by the *Houston Chronicle*.
ROA.130 (¶ 11), ROA.179-80; *see also, e.g.*, Randy Wallace, *55 Year-Old
Woman Worth Millions Says Harris County Probate Court trying to Find
Her Incompetent*," FOX26, Oct. 12, 2022, https://www.fox26houston.com

/news/ 55-year-old-woman-worth-millions-harris-co-probate-court-

incompetent ("Long-time Houstonians have heard many horror stories about

alleged corruption and greed playing out in Harris County Probate Courts").

Kallinen generally advocates against and wants to speak on the important

public topic of abuse in probate courts, as he did in a recent case in which he

has no involvement as a lawyer or litigant. *See* Wallace, *55 Year-Old*

*Woman.*

In order to communicate his views to the thousands of people who

followed Judge Newman's official Facebook page and any other Facebook

user, he posted the following there shortly before the 2022 primary election:

> Don't vote for probate judge Michael Newman.  In my probate
> case he showed favoritism toward my opponents.  Brought up
> an issue opposing counsel did not even bring up on an MSJ and
> found for the movant.  Judges need to be impartial.

ROA.129-30 (¶ 10), 140.  And:

> I would not vote for Michael Newman he has court cronies and
> does favor for them at the expense of other litigants.

ROA.143.  Referring to Judge Newman's "Litigation Practice Tip: Rule 803

(6) of the Texas Rules of Evidence" for counsel, Kallinen also posted:

> Thanks for the tip but if you let cronies win in your court what
> difference does it make?  I would not vote for Michael
> Newman.

ROA.146.

On February 28, 2022, Judge Newman deleted Kallinen's comments and blocked him from being able to view or communicate on the page in the future. ROA.130 (¶ 13). This excluded Kallinen from seeing Judge Newman's account, including the judge's frequent posts about court business. ROA.130 (¶ 13). Kallinen also couldn't comment on any of Judge Newman's posts or interact with anyone else commenting on them. ROA.130 (¶ 13). As Kallinen alleges: "Judge Newman deleted [Kallinen's] comments and blocked [his] access because he disliked [Kallinen's] speech and did not agree with [Kallinen's] viewpoints." ROA.130 (¶ 13). The censorship and blocking remain in effect and are ongoing. ROA.411 (¶ 14).

### III. Kallinen Sued Newman Under 42 U.S.C. § 1983, and the District Court Dismissed the Case Under Fed. R. Civ. P. 12(b)(6)

Kallinen sued Judge Newman in his individual capacity under 42 U.S.C § 1983. ROA.5-39. In his First Amended Complaint, Kallinen claimed that Judge Newman's blocking of his speech criticizing the judge's judicial work violated the First Amendment. ROA.130-32. Because Judge Newman's Facebook page effectively established a government-controlled online public forum, Kallinen alleged, the judge's prevention and removal of Kallinen's critical commentary constituted viewpoint discrimination and government censorship. ROA.130-32.

Judge Newman moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), and the district court granted the motion.  ROA.195-219, ROA.472-88.  The court held that Kallinen failed to sufficiently allege that Judge Newman acted under color of law.  ROA.478-83.  Rather, it concluded that "Judge Newman's Facebook page was used to campaign for office, not to conduct the duties of that office."  ROA.478, 480.  According to the court, the page lacked "sign[s] of an official, state-run page" and "did not bear the trappings of an official, state-run account."  ROA.481. Characterizing the judge's official duties as "issuing rulings, opinions and orders, and conferring with parties," the court noted that Kallinen didn't allege that Judge Newman performed those tasks via Facebook.  ROA.481. And it dismissed the instances Kallinen cited of Judge Newman's official use of the page:

> [T]he examples of posts Mr. Kallinen relies on, and the well pleaded alleged facts, show that Judge Newman's posts consisted of tips about the rules of evidence, communications about new technology in the courthouse, the probate court's docket load, and a celebration of Judge Newman's 110th career trial.  Yes, Judge Newman is shown in his robe, but these posts do not show that Judge Newman was using his Facebook campaign page to conduct his judicial duties.  None of the allegations or examples are of posts about specific cases or rulings.  None of the posts inform attorneys or litigants about matters they might have in his court, and none of the posts offers or invites comment about specific matters or other official court business.

ROA.482.

In addition, the district court denied Kallinen's motion to amend the complaint and add a claim for injunctive relief, ROA.483-84, and granted qualified immunity to Judge Newman because it found the constitutional question at issue to be unsettled. ROA.484-88.

## SUMMARY OF ARGUMENT

The district court erred in dismissing this case. In the first place, Kallinen more than sufficiently alleged state action. Courts have developed several factors for determining when a public official's social media platform is sufficiently governmental, such that barring speech or speakers there constitutes state action. These include whether the official uses the account for work-related purposes or posts about his official duties, whether the account bears the trappings of a governmental outlet, whether the censored speech concerns the official's job performance, and whether state funds or personnel were involved. Kallinen alleged facts satisfying these factors, and the excerpts of Judge Newman's Facebook page in the record confirm his allegations. Judge Newman often posted about his work and used the page to communicate with lawyers and litigants, he consistently displayed images and other trappings of his office on the page, he censored criticism of his job performance, and whether he used the county's staff or

money in connection with the account is unknown because no discovery was permitted.

In dismissing the complaint, the district court effectively found facts. It concluded that Judge Newman's Facebook page promoted his campaign for renomination and therefore wasn't official or governmental. But the court ignored that many of the job-related communications and trappings throughout the page could serve *both* ends: as an organ of Judge Newman's official position and as a means to advance his candidacy. The law doesn't require work-related images and content to be the account's only purpose or substance, and in picking one exclusively the court usurped the place of the factfinder rather than simply test the complaint's allegations under Rule 12(b)(6). We have found no cases dismissing allegations like Kallinen's under Rule 12(b)(6); all such cases, and there have now been many, at least proceeded to discovery.

Finally, the district court erred in denying Kallinen's motion to amend the complaint and in granting qualified immunity to Judge Newman. Kallinen moved to amend his complaint to add a claim for injunctive relief given what had become ongoing and perhaps permanent blocking from Judge Newman's page. That was a valid basis for amendment and would have permitted the case to go forward irrespective of the court's decision on

qualified immunity.  Nor is qualified immunity warranted.  A robust

consensus of out-of-circuit authority establishes the factors governing this

case, and if Kallinen's allegations are properly credited, as they must be at

this stage, Judge Newman's constitutional duty was clear.  Indeed, that duty

was obvious even without such authority.

This Court should reverse the judgment below and remand this case

for discovery and trial.

## ARGUMENT

### I.    Standards of Review

#### A.    Standard of Review of the District Court's Dismissal Under Rule 12(b)(6)

This Court reviews a district court's decision to grant a motion to

dismiss under Fed. R. Civ. P. 12(b)(6) de novo.  *Wampler v. S.W. Bell Tel.*

*Co.*, 597 F.3d 741, 744 (5th Cir. 2010).

Dismissal under Rule 12(b)(6), is only warranted when a plaintiff's

complaint "fails to state a claim upon which relief can be granted."  Fed. R.

Civ. P 12(b)(6).  To survive a motion to dismiss, a complaint need only

contain "enough facts to state a claim for relief that is plausible on its face."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007).  A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Courts analyzing motions under Rule 12(b)(6) "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n. 1 (2002). Further, the court must construe those factual allegations "in the light most favorable to the plaintiff." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002), *cert. denied*, 537 U.S. 1200 (2003). A Rule 12(b)(6) motion tests the sufficiency of the pleadings, not the merits of the case. *George v. SI Grp.*, 36 F.4th 611, 619 (5th Cir. 2022). At the 12(b)(6) stage, a court may neither weigh the strength of the plaintiff's allegations nor fault the plaintiff for a lack of evidence. *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020); *George*, 36 F.4th at 620.

In adjudicating a 12(b)(6) motion, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *see also Inclusive Communities. Project, Inc. v. Lincoln Prop. Co.,* 920 F.3d 890, 900 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2506 (2020).

**B.    The Court Reviews Denial of Kallinen's Motion to Amend for Abuse of Discretion**

A denial of motion to amend the complaint under Fed. R. Civ. P. 15 is reviewed for abuse of discretion.  *Stripling v. Jordan Production Co., LLC*, 234 F.3d 863 (5th Cir. 2000).  Rule 15(a) instructs that leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  The rule therefore "evinces a bias in favor of granting leave to amend."  *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir. 1981).

**II.    The District Court Erred in Dismissing the Case Because Kallinen Adequately Pleaded a Violation of his First Amendment Rights**

**A.    Section 1983's "Color of Law" Requirement**

Section 1983 provides a private right of action against a government official who deprives a person of "any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  To assert a claim, a plaintiff must show both that he was deprived of a right secured by the Constitution or laws of the United States, and that the deprivation was imposed by a person acting under color of law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).

A government official acts under color of law when he misuses or abuses his official power and "there is a nexus between the victim, the

20

improper conduct, and the [official's] performance of official duties."
*United States v. Davis,* 971 F.3d 524, 529 (5th Cir. 2020) (*quoting United States v. Causey*, 185 F.3d 407, 415 (5th Cir. 1999)), *cert. denied,*142 S. Ct. 122 (2021); *Bustos v. Martini Club, Inc*., 599 F.3d 458, 464 (5th Cir. 2005). Use of governmental authority or power "to facilitate" the defendant's actions signifies conduct under color of law. *Tyson v. Sabine*, 42 F. 4th 508, 522 (5th Cir. 2022). That the defendant acted out of personal motives or to further some private interest is irrelevant as long as there is a nexus with official power. *See id.* at 523.

Moreover, the Supreme Court has recognized that determining whether actions carried out by a private party – the capacity in which Judge Newman claims to have acted here – is a "fact-bound inquiry" that involves "sifting facts and weighing circumstances." *Lugar v. Edmonson Oil Co*., 457 U.S. 922, 939 (1982) (*quotation omitted*). This Court has likewise recognized the determination's fact-intensive nature. *See Rundus v. City of Dallas*, 634 F.3d 309, 313 (5th Cir. 2011) (*citing Brentwood Acad. v. Tenn. Secondary School Athletic Ass'n*, 531 U.S. 288, 296 (2001)), *cert. denied*, 565 U.S. 821 (2011). The relevant criteria "lack rigid simplicity" and should therefore be applied flexibly using examples from caselaw, with no one factor controlling. *Brentwood Acad.*, 531 U.S. at 295-96; *accord Doe v.*

*Psychiatric Med. Ass'n*, 102 F.3d 549, 1996 WL 670414 at * 2 (5th Cir. 1996) ("State action determinations are made on a case by case basis by sifting facts and weighing circumstances").

### B.   Kallinen Adequately Pleaded State Action

#### 1. Several Courts Have Consistently Applied Standards for Determining When Officials' Use of Social Media Constitutes State Action

Five circuits have now considered § 1983 claims arising from government officials blocking citizens' speech on Facebook and Twitter. *See Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1171 (9th Cir. 2022), *petition for cert. filed* (2022); *Lindke v. Freed*, 37 F.4th 1199, 1205-06 (6th Cir. 2022); *Campbell v. Reisch,* 986 F.3d 822, 825-28 (8th Cir. 2021); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 235–36 (2nd Cir. 2019), *cert. granted, judgment vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021); *Davison v. Randall*, 912 F.3d 666, 680-81 (4th Cir. 2019). This caselaw establishes workable and consistent factual criteria for determining when an official's social media activity amounts to conduct under color of law.

These criteria include at least (a) whether the official uses social media in connection with official business, (b) whether the page or feed bears at least some recognized trappings of a governmental or official outlet,

(c) whether the censored speech comments on matters of public concern or the official's job performance, and (d) whether state resources are used to establish or maintain the account.   In accord with the fact-intensive nature of the state action question generally, the factfinder's assessment of the totality of these circumstances will determine the ultimate outcome.  *See Davison,* 912 F.3d at 680-81; *Knight*, 928 F.3d at 234-35.

### a.  Use of the Medium in Connection With Official Business

A key factor in answering whether state action exists in this context is whether the defendant's use of the account is "related in some meaningful way to [the defendant's] governmental status and the performance of their duties."  *Garnier*, 41 F.4th at 1171 (cleaned up).  When a page is used to perform the actual or apparent tasks of a government position or communicate about official business, courts are likely to find state action. *Davison*, 913 F.3d at 680-81.

In *Knight*, for example, President Trump's Twitter feed was found to be one of the White House's "main vehicles for conducting official business" because the president used it to communicate about the activities of his administration and "announce matters related to official government business."  928 F.3d at 235-36.  In *Davison*, the Fourth Circuit affirmed a district court's finding of state action where a county supervisor "provide[d]

information to the public about her and the Londoun Board's official activities and solicit[ed] input from the public on policy issues she and the Londoun Board confront." 913 F.3d at 680. The same was true in *Garnier*, where the defendants "regularly posted about school board meetings, surveys related to school district policy decisions, the superintendent hiring process, budget planning, and public safety issues." 41 F.4th at 1171. Because these posts "related directly to Trustees' duties," they reflected state action. *Id.*

Several district courts have reached similar conclusions. A sheriff's repeated messages opposing outside oversight of his office were found to relate to his job duties and therefore support a finding of state action. *See Faison v. Jones*, 440 F. Supp. 3d 1123, 1134 (E.D. Cal. 2020). The same was true of a mayor alleged to have used his social media pages to "disseminate information about city-related activities and issues" and "speak directly to members of the public about issues concerning the city." *Blackwell v. City of Inkster*, 2022 WL 989212 at *1, *11 (E.D. Mich. Mar. 21, 2022). Ditto where a citizen alleged that the president of a board of aldermen "uses his account to perform duties related to his office, including informing his constituents of 'legislative developments and community events' and 'critical public health/safety updates.'" *Felts v. Reed*, 504 F.

Supp. 3d 978, 988 (E.D. Mo. 2020); *see also West v. Shea*, 500 F. Supp. 3d 1079, 1086 (C.D. Cal. 2020) ("multiple examples of posts where Defendant describes the actions she took as mayor, including ordinances she co-authored, ceremonies she officiated, and meetings she attended"); *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 952 (W.D. Wis. 2019) (legislators who used Twitter to "share information on legislative matters, policies, political appearances, and events").

In examining whether official use has occurred, it is not essential that the account *only* relate to the defendant's job.  Most cases feature officials who used their accounts for a mixture of public, personal, and/or campaign purposes, as Kallinen alleges Judge Newman did.  Thus, in *Campbell*, the plaintiffs lost because they could only point to "sporadic" or "occasional stray" official messages drowned out by private communications.  986 F.3d at 826-27.  The court in *One Wisconsin* ruled for the plaintiffs and noted that the Twitter accounts in question were "intertwined with [the defendants'] public responsibilities."  354 F. Supp. 3d at 952.  In *Windom v. Harshbarger*, the court denied a motion to dismiss where the plaintiff alleged "a significant amount of speech" related to official business.  396 F. Supp. 3d 675, 685 (D. W. Va. 2019).  In *Felts*, the court denied the defendant's summary judgment motion because the evidence showed that

official use was more than a "secondary purpose" of the account but rather "a focus" – albeit not *the* or *the only* focus.  2022 WL 898768 at * 7 (E.D. Mo., March 28, 2022) (emphasis added).  Consequently, Kallinen need only have alleged that Judge Newman's official use be more than stray or, put differently, that it be significant – not that it be the sole or even the dominant use.

### b.  Trappings of an Official Account

Courts also examine the trappings of a Facebook page or Twitter feed to see if they use official images or symbols and similar signs suggesting governmental status – that is, whether it is "clothed in the power and prestige of… state office," *Davison*, 913 F.3d at 681; *Garnier*, 41 F.4th at 1172; *Knight*, 928 F.3d at 231, or bears "an imprimatur of governmental connection and authority."  *Leuthy v. Lepage*, 2018 WL 4134628 at * 8 (D. Maine 2018).  The point is to assess how the officials are "representing themselves" to the public, *Garnier*, 41 F.4th at 1173, and how the page might reasonably appear to an ordinary citizen.  *Id.* at 1171 ("both through appearance and content, the Trustees held their social media pages out to be official channels of communication"); *Knight*, 928 F.3d at 236 (asking "how others… regard and treat the account").

Relevant trappings can include the page's name and label.  *See, e.g., Davison*, 913 F.3d at 680-81.  When a Twitter or Facebook account's name includes the government official's title and the page carries a "government official" label, the account could be deemed as bearing the trappings of office.  *Garnier*, 41 F.4th 1158, at 1171; *Davison*, 913 F.3d at 680-81; *Windom*, 396 F. Supp. 3d at 684-85.  Courts also consider elements such the style and contents of the cover pictures and inclusion of a flag, governmental logo, or tagline.  *See*, *e.g*., *Blackwell*, 2022 WL 989212 at *1, *11 (E.D. Mich. Mar. 21, 2022); *Clark v. Kolkhorst*, 2021 WL 5783210, at *5 (W.D. Tex. Dec. 7, 2021); *One Wisconsin Now*, 354 F. Supp. 3d at 952. References to other government publications and contact information are also relevant.  *Garnier*, 41 F.4th at 1171; *Davison*, 913 F.3d at 680-81.  In addition, the account's listed owner also bears on the question; where the owner is listed as a campaign, the page is likely to be private or  personal. *Kolkhorst*, 2021 WL 5783210, at *4.

### c.  Suppressing Speech About Official Matters

Blocking a commenter in order to suppress criticism of official action is a further sign of conduct under color of law.  As the court observed in *Davison*: "That Randall's ban of Davison amounted to an effort to suppress speech critical of such members' conduct of their official duties or fitness

for public office further reinforces that the ban was taken under color of state law." 913 F.3d at 681 (cleaned up).  In *Garnier*, for example, the fact that censored comments related to the defendants' governance of the school district, race relations in schools, and alleged financial misdeeds supported the presence of state action.  41 F.3d at 1172.  The sheriff in *Faison* suppressed comments about his job performance, which contributed to the court's finding of a likelihood of success on the state action element.  440 F. Supp. 3d at 1134.  Underlying this factor is the anomaly of public officials soliciting feedback and opening their social media feeds to constituents and then conveniently denying the existence of official action when they censor unwanted responses on public issues.  *See Blackwell*, 2022 WL 989212 at * 10 ("in accordance with IPD's invitation, the public, including Blackwell, made numerous posts on matters of public concern" (cleaned up)).

### d.  Use of State Resources to Establish or Maintain the Account.

Lastly, courts examine whether government officials or resources are used to create or maintain the social media account.  In *Lindke*, the Sixth Circuit chose to "part ways with other circuits' approach to state action in this novel circumstance" and upheld summary judgment for a city manager largely on the basis that the Facebook page didn't "belong to the office of city manager" and no government employees worked to maintain the

account.  37 F.4th at 1205-06.  Other courts have also looked to this factor, though they fail to give it the centrality assigned by the Sixth Circuit.  *See, e.g., Knight*, 928 F.3d at 231-32 (assistants to president helped maintain his Twitter account); *Sammons v. McCarthy*, 2022 WL 2065976 at * 29 (D. Md., June 8, 2022) (noting inability to resolve factor absent discovery).

## 2. Kallinen Sufficiently Pleaded State Action According to These Factors

Kallinen's amended complaint and the excerpts of Judge Newman's Facebook page submitted by both parties confirm that he adequately alleged conduct under color of state law.

**First**, Kallinen alleged and the page excerpts confirm that Judge Newman frequently used his page to carry out the duties of his office and to post content related to his judicial work.  As the complaint alleges, Judge Newman's page contained "official announcements and communications from his court, depictions of his official duties, and dispensation of public advise [sic] related to his official duties."  ROA.129.  And *all* of these posts were accompanied by photos of the judge at work behind the bench or of his courtroom.  *See* pp. 4-10, *supra*.

Specifically, Judge Newman repeatedly posted about updates and developments that affected lawyers and litigants in his court and which would only be of interest to them.  Thus, in one post he noted that

"technology upgrades have been installed… [which] [l]awyers and their clients [could] start using… next week."  ROA.176.  In another, he announced his court would add a "probate of will docket to its weekly schedule in order to accommodate the needs of the public" and thereby "permit the lawyers we service to begin their estate administrations sooner." ROA.175.  In a third post, after losing the primary election, he informed readers of "[t]he latest technology upgrade… Large screen monitor outside courtroom entrance displaying hearing information."  ROA.171.

In the same vein, Judge Newman repeatedly advised lawyers on how to practice in his court by providing "tips" on matters including rules of evidence in cases "of fiduciary duty, elder abuse & financial exploitation," ROA.172; how to how to remove an independent executor, ROA.311-12; "preparing the persuasive motion," ROA.330, and ensuring "effective motion and oral advocacy in probate court."  ROA.332.  He also posted about what was happening in his court generally, presumably to keep the public up to date about his work as a public official.  These also occurred before and after the primary election and included news about his completion of trials, the fact of his being upheld on appeal, signing orders over a weekend, and so on.  *See* pp. 8-10, *supra*.

Finally, Judge Newman frequently communicated about performing the typical kinds of public, ceremonial and administrative duties expected of any elected state judge or other comparable official, including unveiling another judge's portrait, congratulating new lawyers, commending staff, dedicating a public plaza with other officials, presenting a scholarship, appearing at a local law school, speaking on a judicial panel, and advising the public about estate law on the radio. *See* p. 10, *supra*; *West*, 500 F. Supp. 3d at 1086 (noting mayor's posting of "ceremonies she officiated, and meetings she attended").

Alleging repeated communication of this sort easily satisfies the minimal requirements of Rule 12(b)(6). The posts are about Judge Newman fulfilling his official duties as a judge and inform the public about his work in a general sense, *see, e.g., Knight*, 928 F.3d at 235-36 (President Trump's use of Twitter to make announcements to the public); *Garnier*, 41 F.4th at 1171 (school trustees' announcements); *Davison*, 912 F.3d at 680 (county chair's posts inform public about board's "official activities"), as well as providing targeted notifications and practice information to the more specific audience of those appearing before him as a public official: litigants and lawyers.

Obviously, only Judge Newman could use Facebook this way; no ordinary citizen could inform the public and lawyers and litigants about the functioning of Probate Court No. 2. *See Davison*, 912 F.3d at 681 ("A private citizen could not have created and used the Chair's Facebook page in such a manner"); *Lindke*, 37 F.4th at 1203 (state action exists where social media use "couldn't happen in the same way without the authority of the office" (cleaned up)). In that sense, Judge Newman's page is uniquely a "tool of governance," *Knight*, 928 F.3d at 236, and an "organ of official business." *Attwood v. Clemons*, 526 F. Supp. 3d 1152, 1168 (N.D. Fl. 2021), not the product of a private citizen. As the administrators of their courts, merely operating a Facebook page with official content can be considered part of their basic public functions.

**Second,** Kallinen alleged and the Facebook page excerpts demonstrate that Judge Newman wasn't shy about making full use of the trappings of his office. Throughout the page, from the first day excerpted to the last, which was well after his primary election (December 2021 to May 15, 2022), there are photos of Judge Newman in his robe, Judge Newman doing judicial work behind the bench, Judge Newman's courtroom, the court's technology and equipment, and other images of the judge at work and his workplace. ROA.248-352. His personal photo at the top of the

page, before and after the campaign, features him in his robe in his courtroom flanked by flags. ROA.149, ROA.248. Before and after the campaign, the page's introduction lists him as the judge of Probate Court 2. *Id*.

These are exactly the trappings courts have recognized as reflecting official use and, therefore, conduct under color of law. *See Garnier*, 41 F.4th at 1171 (identification as government officials and use of titles); *Davison*, 912 F.3d at 680-81 (title of page lists official position, page characterized as that of a government official, links to official emails and contact information); *Blackwell*, 2022 WL 989212 at * 11 (use of position in title and of city's logo and tagline); *Faison*, 440 F. Supp. 3d at 1134 (photo in sheriff's uniform, photo of police car, use of official title); *One Wisconsin Now*, 354 F. Supp. 3d at 952 (people in uniform and photo of flag); *Windom*, 396 F. Supp. 3d at 684 ("the title of each page reflected the elected official's position").

As noted above, this factor gauges whether the page appears to the public as something that might be governmental. In Judge Newman's case, it is mistaken to hold at this initial stage of the case that the page cannot possibly convey that impression to ordinary citizens as a matter of law. Indeed, how would a citizen, or a pro se litigant, know for certain from the

many photos of Judge Newman in his judicial robes and the many posts relating to his work that the post *isn't* official?  Simply because other posts and images relate to other topics?  At most this suggests a page devoted to more than one purpose, one of which was governmental – not something so one-sided or unequivocally private that Kallinen hasn't even alleged state action at the beginning of the case.

**<u>Third</u>**, there is no dispute that the post giving rise to this dispute related to Judge Newman's position, not his family or personal life.  The posts Judge Newman deleted voiced Kallinen's criticism that the judge showed favoritism toward certain lawyers and parties while presiding in court.  ROA.129-130, ROA.143, ROA.146.  Then Judge Newman blocked Kallinen entirely.  ROA.129-30 (¶¶ 10-13).

This strengthens the case for Judge Newman's having acted under color of law because the conduct at issue concerned a matter related to his public position and work rather than only something private.  *See Garnier*, 41 F.3d at 1172; *Davison*, 913 F.3d at 681; *Faison*, 440 F. Supp. 3d at 1134. Judge Newman's page was open for public viewing, had an open comment section allowing anyone to post, and actually did garner public responses of all kinds.  ROA.129-30 (¶ 10); ROA.136-69.  He thereby solicited feedback about what he was posting, including voluminous content about his work.

As the caselaw makes clear, Judge Newman can't have it both ways – censoring a critic of his performance as a public official while claiming he wasn't acting as a public official.

**Fourth,** there is the question whether Judge Newman used government resources of any kind in creating or maintaining his Facebook page. *See Lindke*, 37 F.4th at 1205-06. Kallinen hasn't charged that Judge Newman did so because he lacks a good faith basis for making the allegation. On the other hand, there would be no way for him to know at this stage of the case, which simply highlights the error of dismissing this action before discovery. In *Sammons*, the district court denied a motion to dismiss for precisely this reason:

> Critically, both *Davison* and *Campbell* involved rulings that were made following bench trials. And, those trials followed the opportunity to engage in discovery and gather evidence concerning the degree of involvement that the public official had with regard to the administration of the social media account and its content. In contrast, Sammons has not yet had the opportunity to engage in discovery, so as to contextualize the posts captured by the screenshots that have been provided to the Court. Nor has plaintiff been able to explore the relationship between McCarthy and the group that apparently administered the Page, the "Friends of Alan McCarthy," or ascertain the manner in which the County Executive Page was managed.

2022 WL 2065976 at * 29.  Here too, the inability of Kallinen to take discovery on this factor before the district court dismissed this case argues for reversal.

In sum, Kallinen has alleged the existence of state action under the legal standards now widely accepted to govern cases like this.

### 3.   The District Court's Grounds for Dismissal Are Erroneous and Held Kallinen to an Unduly High Burden

The district court correctly identified the caselaw and factors discussed above but erred in simply ignoring or downplaying the many indicia of state action Kallinen alleged and, in effect, weighing the evidence against him.  This resulted in an overly stringent burden the plaintiff shouldn't have faced at the outset of a case.

Most importantly, the district court evaluated Judge Newman's posts and decided that the page "was used to campaign for office, not to conduct the duties of that office."  ROA.480.  This conclusion doesn't test Kallinen's pleadings under the lenient 12(b)(6) standard – it resolves a disputed issue of fact as if the court were the ultimate factfinder.  As discussed above, posts informing lawyers, litigants, and the public about technology, new dockets intended to expand the number of probate hearings, and how to practice in Probate Court 2 are also consistent with Judge Newman acting as a judge,

not simply a candidate for renomination.  The same is true for the many posts communicating the various typical administrative and ceremonial duties of the office.  And the innumerable phots of Judge Newman in his robes and working behind the bench and of his courtroom are equally consistent with an official page, not only a campaign page.  The page listed his occupation as well as his candidacy.

Analogous cases recognize that officials' posts about carrying out their public duties may serve the purpose of advancing a campaign at the same time that they relate to official business.  Because one doesn't exclude the other, courts leave the ultimate question of state action to the factfinder.  At this stage, inferences must be construed in Kallinen's favor, not Judge Newman's – meaning that communications and images open to more than one possible meaning or interpretation must be construed in the light favorable to Kallinen.

In *Garnier*, for example, the district court conducted a bench trial on the plaintiff's § 1983 claim and, on review, the court of appeals acknowledged that some of the posts in question served the defendant's campaign.  41 F.4th at 1172.  It rejected defendants' argument that this meant the page was only campaign-related as a matter of law, however.  *Id.*  The court of appeals in *Campbell*, a decision stressed by the court below, held

that the page at issue was used "overwhelmingly for campaign purposes" with only "occasional stray messages that might conceivably be characterized as conducting the public's business."  986 F.3d at 826-27. Crucially, though, it reached that conclusion after a bench trial, and even then, one member of the appellate panel examined the same evidence and reached the opposite conclusion.  *Id*. at 828-29.  *Campbell* underscores the unsuitability of summary judgment in cases like this, let alone dismissal under Rule 12(b)(6).

District court decisions reinforce the point.  In *Sammons*, the plaintiff emphasized the official trappings of the defendant's account and repostings from a government page, while the defendant emphasized campaign-related photos and posts "promoting [the defendant's] suitability for office, and distinguishing [him] from his primary opponent."  2022 WL 2065976 at *28.  The court acknowledged that the page might be campaign-focused rather than official but nonetheless ruled that "dismissal of the suit on this basis would be premature," pointing out that *Campbell* and *Davison* both followed discovery and trial.  *Id*. at * 29.

*Attwood* is similar.  The district court there observed that, taking all inferences in the defendant's favor, the site "reasonably trace[d] back to a campaign purpose, precluding state action."  526 F. Supp. 3d at 1167-68.  At

the same time, construing evidence in the plaintiff's favor, posts about
official business reflected a governmental purpose. *Id.* It therefore denied
summary judgment. *Id.* Likewise, in *Felts*, the court recognized that some
of the defendant's posts were "just as indicative of a political candidate's
account as an official government account," rendering the overall picture
"indeterminate" and "inconclusive." 2022 WL 898768 at * 7. It therefore
denied summary judgment.

Importantly, the district court here also failed to analyze the nature of
Judge Newman's page after the primary campaign ended on March 1, 2022.
After Newman failed to secure renomination, he continued posting about the
same sorts of court-related updates, lawyers' tips, status reports, and
ceremonial functions he had before. *See* pp. 4-10, *supra*. That refutes the
district court's conclusion that, before March 1, 2022, such posts could only
be understood as attempts to further Judge Newman's campaign. Moreover,
in responding to Kallinen's motion, Judge Newman only provided six
months of the page's history, from December 20221 to May 2022.
Discovery would yield additional evidence about the nature of the page both
before this interval, during the campaign, and after May 2022, when the
campaign receded even farther into the past.

Two other points bear mention here.  Texas law discourages and may in some circumstances criminalize the use of official paraphernalia and backdrops – like appearing in a judge's robe and taking campaign photos in public buildings – to run for office.[2]  Consequently, the inference most favorable to Kallinen (and Newman) is that the judge knew of and wished to follow this ethical and legal guidance and intended these images to reflect his official position, not his campaign for office, since the latter intent could raise questions about adherence to election-related rules and guidelines.

By the same token, Judge Newman's earlier Facebook page, created and maintained before he took office in 2019, illustrates his awareness that he could use a purely private page to campaign for office rather than commingling campaign and official business and images.  At least one post on that earlier page promoted his 2018 campaign.  ROA.235.  Having affirmatively and deliberately chosen to yoke the two projects together in one account, Judge Newman shouldn't be able to claim now that his current page is solely private.  He was well aware that he could have maintained a purely personal campaign page had he wished to.

---

[2]     A Texas Ethics Commission opinion holds that "the best practices for public officers are to remove themselves from government facilities and decline to use other government resources, of which they have custody or possession, for campaign activity, including political advertising."  Tex. Ethics Comm. Op. No. 550 (2019).  Texas law also prohibits a public servant from "misus[ing] government property, services, personnel, or any other thing of value belonging to the government" with "intent to obtain a benefit."  TEX. PENAL CODE ANN. § 39.02(a).

In addition to its leap forward into fact-finding about whether Judge Newman's page was only campaign-related, the district court found that the judge's page wasn't official based on an extremely narrow and formalistic description of the job of a probate judge:

> Judge Newman's official duties as a judge include issuing rulings, opinions, orders, and conferring with parties.  Mr. Kallinen does not allege that Judge Newman used the Facebook campaign page to perform his duties as a judge, such as conferring with parties or counsel or to issue orders or rulings.  Under the traditional definition of color of state law, Judge Newman did not use his Facebook campaign page to conduct official judicial business.

ROA.481.

This definition of Judge Newman's job – issuing decisions and conferring with litigants – is far too limited.  State judges also typically administer their dockets, preside over trials and other proceedings, establish and announce rules and procedures in their courts, and interact with the public in myriad ways functional and ceremonial as elected officials.  All of the posts Kallinen relies on for state action relate to these duties and describe his work as a judge rather than his private life: his completion of trials, his implementation of technology to administer his courtroom, his addition of a new docket to speed resolutions, his instructions and advice to lawyers who practice before him, and his performance of public and ceremonial tasks only a judge could undertake.  True, these job duties can be performed

41

without Facebook, but that doesn't mean Judge Newman's posts weren't job-related communications meant to inform the public about how he was serving the public. *See*, *e.g., Knight*, 928 F.3d at 235-36; *Garnier*, 41 F.4th at 1171; *Davison*, 912 F.3d at 680. And courts also consider a position's "apparent" duties, not simply the barest bones of its mandated ones. *Davison*, 913 F.3d at 680-81; *Knight*, 928 F. 3d at 236 (relevance of "how others… regard and treat the account").

Later, making this same point, the district court observed that "[n]one of [Kallinen's] allegations or examples are of posts about specific cases or rulings. None of the posts inform attorneys or litigants about matters they might have in his court, and none of the posts offers or invites comment about specific matters or other official court business."

This is simply mistaken. Judge Newman posted about a specific case after being upheld by the court of appeals and identified it. ROA.253-54. He often posted about finishing specific trials which, though he didn't list case names, would be easily ascertainable using the court and date. ROA.321, ROA.339, ROA.352. Judge Newman's posts *did* "inform attorneys or litigants about matters they might have in his court" by telling them how his courtroom, his technology, his docket, and his in-trial practices functioned. And he did "invite comment about specific matters or

other official court business" by opening his page to public comment from anyone on the job-related topics he discussed. His posts on court business attracted numerous responses from members of the public – most of which isn't reproduced in the excerpts Judge Newman provided below. The fact that Judge Newman generally didn't identify specific cases in no way means that his posts about his court and how he performed his job were private or unrelated to his judicial duties. Nor does it matter that some other judges might choose not to post about such topics or maintain social media accounts at all.

Indeed, the Texas Estates Code requires that probate judges call their dockets in an orderly manner. TEX. EST. CODE ANN. § 53.101. Thus, a reasonable viewer of Judge Newman's page might conclude that publicizing how his docket is presented and where it is displayed falls within this statutorily mandated judicial duty. ROA.452. A reasonable person could also presume that his post about technology in the courtroom fulfills his duty to maintain orderly operations there. *See* ROA.457. *See* TEX. CODE JUD. CONDUCT, CANON 3(B)(3). (judge "shall require order and decorum in proceedings before the judge"); TEX. CODE JUD. CONDUCT, CANON 3(B)(9) (judge "should dispose of all judicial matters promptly, efficiently and fairly").

Finally, the district court found that Judge Newman didn't misuse his official power; emphasized that "[b]locking access to a Facebook page can be done by any person who has such a page, without needing or using the power of any office;" and observed that "Judge Newman's power as a probate judge was not what enabled him to delete Mr. Kallinen's comments from the Facebook page or to block Kallinen from further access to that page." ROA.476-77, ROA.482-83. The court in *Knight* persuasively answered this argument: "the fact that any Twitter user can block another account does not mean that the President somehow becomes a private person when he does so." 928 F.3d at 236. Here too, the question isn't whether deleting posts and blocking users is a uniquely governmental task; it's whether an official acts under color of law when he does so in light of the totality of the circumstances.

*　*　*　*　*

The district court effectively decided facts and drew inferences in Judge Newman's favor rather than merely examine the allegations to see whether they stated a claim for relief. Posts and images that could connote either campaign promotion or official messaging were adjudged to be the former, as if the Court was deciding the merits of the case. Yet of the many courts to face 1983 claims like Kallinen's, *none* we know of resolved them

on the issue of state action before discovery, though every defendant argued

that issue.[3]  Judge Newman's account's "overall theme" is a matter of

factual interpretation that should be left to the factfinder after discovery.

*Campbell*, 986 F.3d at 826.  Such discovery will give a clearer picture of the

account – not just six months – and will also elucidate whether any

government support was involved in its creation or maintenance.  Especially

in cases like this, where the key inquiry is fact-intensive and entails carefully

weighing and sifting the relevant circumstances, the district court should

have permitted that discovery to go ahead.

### III.    The Court Should Have Allowed Kallinen to Amend His Complaint

The district court also denied Kallinen's motion for leave to amend as

futile, ROA.472, but Kallinen should have been permitted to add his request

for injunctive relief.

---

[3]  *See Garnier*, 41 F. 4th at 1167 (trial); *Lindke*, 37 F.4th at 1202 (summary judgment); *Campbell*, 986 F.3d at 823 (trial) *Knight*, 928 F.3d at 233 (summary judgment); *Davison*, 912 F.3d at 676 (bench trial); *Sammons*, 2022 WL 2065976 at * 29 (denying motion to dismiss); *Attwood*, 526 F. Supp. 3d at 1173 (denying summary judgment) *Clark*, 2021 WL 5783210 at * 1 (bench trial); *Felts*, 504 F. Supp. 3d at 982 (denying motion to dismiss); *West*, 500 F. Supp. 3d at 1088 (denying motion to dismiss); *Faison*, 440 F. Supp. at 1139 (granting plaintiff's motion for preliminary injunction); *One Wisconsin*, 354 F. Supp. 3d at 941 (granting plaintiff's motion for summary judgment); *Windom*, 396 F. Supp. 3d at 678 (denying motion to dismiss); *Leuthy*, 2018 WL 4134628 at * 17 (denying motion to dismiss).  In one case, the district court dismissed under Rule 12(b)(6) on grounds of qualified immunity – not the absence of state action.  *See Blackwell*, 2022 WL 989212 at * 13.

Because "[t]he court should freely give leave [to amend] when justice so requires," a substantial reason is needed to deny the motion. FED. R. CIV. P 15(a)(2). *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004). While it is "within the district court's discretion to deny a motion to amend if it is futile," the amended complaint must fail to state a claim for denial to be justified. *Stripling,* 234 F.3d at 872-3.

Kallinen's amendment sought to add a claim for injunctive relief based on months of ongoing constitutional deprivation: Judge Newman's continued removal of his posts and blocking of him on Facebook. ROA.404. When Kallinen instituted this action on March 1, 2022, and when he amended as of right two months later, the censorship at issue had just begun. But Judge Newman's ongoing and now apparently permanent squashing of Kallinen's comments and ability to speak changes the calculus. ROA.411. "Where the failure to include in the complaint a known theory of the case arises not from an attempt to gain tactical advantages but from a reasonable belief that the theory is unnecessary to the case, denial of leave to amend is inappropriate." *Dussouy*, 660 F.2d at 599.

For the reasons set forth below, qualified immunity is inapplicable to this case. Regardless, the court should protect First Amendment rights in cases of ongoing violation. *See Morse v. Frederick*, 551 U.S. 393, 432-3

(2007) ("A 'qualified immunity' defense applies in respect to damages actions, but not to injunctive relief").  Although Judge Newman lost his bid for renomination, that portion of his page reflecting official status will continue on after he leaves office unless Judge Newman removes the page from Facebook.  On remand, the district court can determine whether the page continues to exist and assess its nature for the purpose of evaluating the possible existence of an ongoing violation.

The point of qualified immunity is to protect government officials from threats of personal liability while performing their jobs in good faith, *Pierson v. Ray*, 386 U.S. 547, 555 (1967), not permanently shield ongoing constitutional violations from judicial scrutiny.  That is especially true here, where it happens that a judge-made doctrine (qualified immunity) is insulating a judge from public examination and comment despite the importance of the issues involved.  *See, e.g., White*, 536 U.S. at 794 (Kennedy, J., concurring) ("What Minnesota may not do, however, is censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer").

IV.    **The District Court Erred in Extending Qualified Immunity to Judge Newman**

A.    **The Qualified Immunity Standard**

The qualified immunity inquiry consists of two questions: whether the defendant violated a constitutional right, and whether the right is "clearly established" when the alleged conduct occurred.  *Ashcroft v. al-Kidd,* 563 U.S. 731, (2011); *Villareal v. City of Laredo, Tex.*, 44 F.4th 363, 369 (5th Cir. 2022) ("To defeat qualified immunity at the motion to dismiss stage, [the plaintiff] must allege, first, that the officials violated her First Amendment rights, and second, that their actions were objectively unreasonable in light of clearly established law").

A right is clearly established if "a reasonable official would understand that what he is doing violates that right."  *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010), *cert. denied*, 563 U.S. 1021 (2011). "While a plaintiff need not find a case 'directly on point, ... existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Roque v. Harvel*, 993 F.3d 325, 334-35 (5th Cir. 2021) (*quoting Mullinex v. Luna*, 577 U.S. 7, 12 (2015)).  This burden can be met by proffering binding authority or a robust consensus of persuasive authority from other jurisdictions.  *Buehler v. Dear*, 27 F.4th 969, n. 66 (5th Cir. 2022); *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013).  Alternately, the

violation may be obvious: "The doctrine of qualified immunity does not always require the plaintiff to cite binding case law involving identical facts. An official who commits a patently 'obvious' violation of the Constitution is not entitled to qualified immunity." *Villareal*, 44 F.4th at 371 (*citing Hope v. Peltzer*, 536 U.S. 730, 745 (2002)).

Courts may bypass the first prong of the qualified immunity test and look only to whether the right at issue was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But appellate courts often see value in offering guidance to lower courts and state officers when necessary. As the Supreme Court has observed, "we have permitted lower courts to avoid avoidance – that is, to determine whether a right exists before examining whether it was clearly established." *Camreta v. Greene*, 563 U.S. 692, 706 (2011). While courts should hesitate before reaching unnecessary constitutional questions, "following the two-step sequence – defining constitutional rights and only then conferring immunity – is sometimes beneficial to clarify the legal standards governing public officials." *Id.* at 707. This Court also sometimes "elect[s] to address both issues… 'in order to provide clarity and guidance' for officials and courts going forward – as we often do in cases involving qualified immunity, despite enjoying 'discretion to leapfrog the merits.'" *Engle v. Lumpkin*, 33 F.4th 783, 796 n.

42 (5th Cir. 2022) (*quoting Joseph v. Bartlett*, 981 F.3d 319, 331 (5th Cir. 2020)).

### B.    Qualified Immunity is Unwarranted Because Kallinen's Rights in this Circumstance Were Clearly Established

The district court erred in granting qualified immunity.  As for the test's first prong, Kallinen adequately stated a First Amendment claim, *see* Point II, *supra*., and the Court should exercise its discretion to say so expressly whatever its view of the "clearly established" element.  Although Kallinen's First Amendment rights in this setting should have been clear and obvious to Judge Newman, this Court hasn't yet examined a case like this, unlike five other circuits.  It should therefore confront and resolve the state action issue now because it will often arise when officials' social media accounts are at issue.

In any event, Kallinen's rights were clearly established.  The district court acknowledged that a government official may not censor unwanted speech in even a "metaphysical forum" like his own social media feed, but it then found a dearth of authority establishing that an account "used by a citizen seeking reelection to an official position is a government-created forum subject to First Amendment protection."  ROA.485-86.  This framing presupposes the court's erroneous factual conclusion that Judge Newman's

page is best viewed as one of a candidate "seeking reelection to an official position," however.  As discussed above, a factfinder could just as easily conclude that the page is primarily or equally one which intends to and does function as an official organ for a state officer.  If that premise is accepted – as it must be at this early stage, since inferences are construed in Kallinen's favor – a robust consensus of out-of-circuit law clearly indicates that censoring critical, third-party speech on the social media feed of a government actor violates the First Amendment.

Specifically, four circuits have now held that a government officer may not block or remove criticism from a Facebook page or Twitter feed used in connection with public business and bearing official trappings.[4]  *See Garnier* (July 27, 2022); *Campbell* (2021); *Knight* (2019); and *Davison* (2019); Point II(B)(1), *supra*., discussing cases.  Only one circuit analyzes cases like these using slightly different factors, and Kallinen could well meet that test, too, after discovery.  *See Lindke* (June 27, 2022), *supra*.  Even in *Campbell*, a case decided before this one began where the plaintiff's claim

---

[4]   Judge Newman initially deleted Kallinen's criticism and blocked him altogether on February 28, 2022.  ROA.130 (¶ 13).  But since the posts remain hidden and Kallinen is still blocked, Judge Newman is perpetrating a continuing First Amendment violation that should be judged as of whenever the Court decides this appeal or Judge Newman restores the posts and Kallinen's ability to post.  And even if the state of the law is assessed before February 28, 2022, three courts of appeals – *Campbell, Knight,* and *Davison* – had ruled on the issue by then and employed the same legal standards.

initially prevailed at trial before failing in the court of appeals, the legal standards governing the First Amendment were clear and easily applied from other prior, out-of-circuit cases. *See* 986 F.3d at 825-28. By now, the criteria for what constitutes an official social media page have been well-established, leaving Judge Newman in no doubt about the applicable legal standards.[5]

True, qualified immunity was recently applied in *Garnier*, 41 F.4th at 1183-84, but the violation in that case occurred in 2017, and as the court noted "there were no court of appeals cases addressing similar facts. Only in the five years since… did four circuits decide cases concerning the First Amendment's application to the decisions of government officials to block members of the public from their government social media accounts." *Id*. at 1184. Here, of course, Judge Newman had the benefit of the many circuit-

---

[5]   The Tenth Circuit granted qualified immunity to a county commissioner alleged to have blocked a citizen on Facebook but only because, unlike Kallinen's, the plaintiff's complaint lacked allegations of how the commissioner created and titled the page, significantly distinguishing his case from *Davison*. *Swanson v. Griffin*, 2022 WL 570079 at * 4 (10th Cir., Feb. 25, 2022) *cert. denied*, 2022 WL 4651787 (2022). The only other authority cited was this Court's decision in *Robinson v. Hunt Cty., Tex*., 921 F.3d 440, 448 (5th Cir. 2019), where the existence of a public forum was only assumed, and *Knight*, leaving the plaintiff with only one out-of-circuit authority, which the court deemed insufficient. 2022 WL 570079 at * 4.

level decisions the defendant in *Garnier* lacked. Some district courts have also denied qualified immunity in recent, similar cases.[6]

Even aside from the consensus of authority from other circuits, the First Amendment's proscription of government censorship on a government platform for speech is obvious. *See, e.g., Villareal*, 44 F.4th at 369-73. The Amendment's applicability to a forum like Facebook has been apparent since at least the Supreme Court's decision in *Packingham*, where the Court reviewed free speech online, invalidated overbroad restrictions on sex offenders' use of all social media, and observed that "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." 137 S. Ct. at 1737. No court has denied that a Facebook account open to the public establishes a forum for speech. *See id.*; *Knight*, 928 F.3d at 237 ("Opening an instrumentality for communication for indiscriminate use by the general public creates a public forum" (cleaned up)); *Davison*, 912 F.3d at 681. And this Court has recognized that whether Facebook is thought of as "a limited or designated public forum" is immaterial since the Constitution "'forbid[s] the State to exercise viewpoint discrimination' in either setting, 'even when the limited public forum is one of its own creation.'" *Robinson v. Hunt Cty., Tex.*, 921

---

[6]  *See Sammons*, 2022 WL 2065976 at * 34; *West*, 500 F. Supp. 3d at 1087; *but see Blackwell*, 2022 WL 989212 at * 12; *Attwood*, 526 F. Supp. 3d at 1175-76.

F.3d 440, 448 (5th Cir. 2019) (*quoting Rosenberger v. Rector and Visitors of Univ. of VA.*, 515 U.S. 819, 829 (1995)).

Given this established law confirming that Facebook is a forum in which viewpoint discrimination would trample free speech, Judge Newman had fair warning that censoring and blocking a critic on his page would violate the First Amendment.  Of course, he maintains that the forum he created was private, not official, meaning that the First Amendment doesn't apply.  But if Kallinen prevails on that point, as he should at this incipient stage of the case, *see* Point II, *supra*., qualified immunity is then necessarily inapplicable.

## CONCLUSION

The Court should reverse the judgment below and remand Kallinen's

First Amendment claim under 42 U.S.C. § 1983 for discovery and trial.


October 13, 2022                    Respectfully Submitted,


                                   s/  *Martin J. Siegel*
                                    Martin J. Siegel
                                   *Director, Appellate Civil Rights Clinic*

                                   Melissa Holmes
                                   Yovana Marinkovik
                                   Matthew Welsh
                                   *Student Attorneys*

                                   University of Houston Law Center
                                   4170 Martin Luther King Blvd.
                                   Houston, Texas 77204
                                   (713) 743-2100


                                   Alexander C. Johnson
                                   511 Broadway Street
                                   Houston, Texas 77012
                                   (573) 340-3316


                                    *Counsel for Plaintiff-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day of October 13, 2022, the foregoing

Plaintiff-Appellant's Brief was served on the following via the Court's ECF

Filing system:

Laura Beckman Hedge
Harris County Attorney's Office
1019 Congress, 15th Fl.
Houston, TX 77002

*Counsel for Defendants-Appellees*

s/_____ *Martin J. Siegel*_____
Martin J. Siegel

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. Civ. P. 32(a)(7)(B) because this brief contains 11,671 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief is printed in a proportionally spaced typeface using the Microsoft Word 2004 for Mac, Version 11.5.6, program in 14 point, Times New Roman font in body text and 12 point, Times New Roman font in footnote text.

s/    *Martin J. Siegel*
Martin J. Siegel

Dated:  October 13, 2022